

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00200-CV

THOMAS G. MCCOY                                                    APPELLANT

V.

ALDEN INDUSTRIES, INC.                                            APPELLEES

----------

### FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 48-252036-11

----------

## OPINION

----------

### I. INTRODUCTION

Parties that engage in complex business transactions sometimes later dispute whether or not an agreement exists. Depending on the issues raised, the conflict can involve questions of law, *see McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013); questions of fact, *see Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 745–46 (Tex. 1988); or both, *see Valores*

*Corporativos, S.A. de C.V. v. McLane Co.*, 945 S.W.2d 160, 165–67 (Tex. App.—San Antonio 1997, writ denied). This case falls into the third category.

Appellant Thomas G. McCoy sued Appellee Alden Industries, Inc. for breaching two agreements that he claims the parties made as part of a comprehensive agreement involving a partial stock redemption and recapitalization transaction—(i) an insurance-funded stock redemption agreement and (ii) a compensation-package agreement. Both sides moved for summary judgment; the trial court granted Alden's motion but denied McCoy's. McCoy appeals. Because neither side was entitled to summary judgment, we will affirm in part and reverse and remand in part.[1]

## II. BACKGROUND

Alden is a Fort Worth-based holding company with four subsidiaries—two that manufacture commercial or industrial water heaters, boilers, or burners and two that market the products. The following individuals who are associated with Alden are relevant to this appeal: McCoy, Craig Adams, Stephen Youts, and Timothy MacKenzie. McCoy's association with Alden and its affiliates has endured for nearly a quarter century, and by mid-2008, he was Alden's chief executive officer and chairman of the board. Adams worked his way up through the business to become Alden's president in 2004, and in July 2008, he replaced McCoy as chief executive officer and was elected to Alden's board as vice

---

[1]The undersigned became the author of this majority opinion on April 28, 2015.

2

chairman. Youts has been a member of Alden's board of directors since 1997, and MacKenzie has served two stints on Alden's board—one from 1997 to 2004 and another from 2008 to the present.

In 1997, Alden's management shareholders acquired a majority control of the company from a private equity group. After the transaction, McCoy's ownership interest in Alden increased from approximately 6% to 52%. By early 2008, McCoy owned a controlling interest in Alden of almost 60% of its outstanding stock.

In late 2007, McCoy decided to retire, so he began considering options to sell his interest in Alden. McCoy, Adams, and Youts met with several investment banking firms, but Adams, who was concerned about the future of Alden and its employees under the ownership of a third party, suggested to McCoy that he wanted to explore whether McCoy's shares could be redeemed internally. Shortly thereafter, McCoy informed Adams that he and Youts had formulated such a transaction—a recapitalization whereby Alden would redeem a portion of McCoy's shares, thus allowing Alden to remain a management-owned entity. McCoy agreed to pursue the proposed transaction, and the parties moved forward with the details and the documents.

In an effort to inform Alden's management shareholders about the proposed transaction—so that they could authorize the voting of their shares— Youts prepared a document that summarized the terms (the "summary sheet"). The final version of the summary sheet, dated May 31, 2008, and titled "Alden

Industries, Inc. Stock Repurchase and Recapitalization June 6, 2008," contains sections explaining the "Purpose" of the transaction, how it will be financed, who will purchase warrants, what changes will be made to the voting trust and the board's membership, and, among other things, the insurance-funded redemption of McCoy's and Adams's shares upon their death. Titled, "Stock Buy-back Insurance," that section states,

> The Company will have life insurance on McCoy and Adams to fund the repurchase (at a total cost equal to the dollar amount of the respective coverage) of all shares of either party (including all shares held by family interests, if any) in the event of death. Amounts – McCoy $30.0 million, Adams $22.0 million.

A cover letter was attached to the summary sheet. Dated June 2, 2008, and signed by McCoy, the letter was circulated to the shareholders and detailed the proposed recapitalization transaction:

> Alden is proposing to enter into a transaction with me personally (not as Trustee) whereby I will sell 1,402 shares of my stock to Alden for $35 million ($25 million in cash and a $10 million note). As the result of the transaction, the majority stock position I personally own in Alden (2342 shares - approximately 60% of Alden) will be reduced to a minority position of 940 shares. To finance the purchase of 1,402 shares of my stock, Alden will enter into a recapitalization transaction with a new senior lender, First American Bank, and with a new mezzanine lender, Merit Mezzanine Fund. Merit will also purchase a warrant entitling them to purchase shares equivalent to approximately 13% of the common stock of Alden. As part of the recapitalization, I will loan Alden $10 million of the funds being raised to finance the purchase of my stock. I will also purchase a warrant entitling me to purchase shares equivalent to approximately 6 2/3% of the common stock of Alden. . . .
>
> At the conclusion of the proposed transaction, I will own approximately 36.5% of Alden on a fully diluted basis, including my

4

remaining shares of approximately 30% and my warrant equivalent to approximately 6 2/3%.

.  .  .  .

These documents lead to the conclusion that the going concern fair value of Alden and its subsidiaries (without debt) is approximately $75,000,000. I am being paid a negotiated purchase price for my stock that reflects the sum of the fair value of the stock I am selling plus a substantial premium which I required in order for me to be willing to relinquish my control of Alden and become a minority shareholder.

Your stock will be in a new voting trust (the "2008 Voting Trust"), and Craig Adams will be the Trustee of the 2008 Voting Trust. Craig will also become the Chief Executive Officer of Alden, and he will be elected to Alden's board of directors. I will continue in my role as Chairman of Alden (as an executive Chairman in a non-management capacity).

.  .  .  .

In order to authorize Alden to enter into the transaction, there will be a shareholder meeting for such approval. As Trustee of the 1997 Voting Trust, I have authority to vote all of the shares held in trust. However, because I am a party to the proposed transaction, I am committed to voting your shares which are held in the 1997 Voting Trust as you direct, and I intend to abstain from voting my shares.

Alden's board of directors will accept the action of the shareholders with respect to the proposed transaction and, assuming the transaction is approved by a majority of the shares other than McCoy, will pass resolutions formally authorizing the appropriate officers to execute all necessary transaction documents.

Adams discussed the proposed transaction with each of the shareholders, who all voted in favor of it.[2]

---

[2]Adams described the transaction as "the best of the available options for those of us who were continuing with the business."

On or about June 9, 2008, the parties to the recapitalization transaction signed closing documents, including the "Stock Redemption Agreement Between Alden Industries, Inc. and Thomas G. McCoy," in which Alden agreed to redeem 1,402 shares of McCoy's common stock in exchange for $35 million; the "Loan and Security Agreement" between Alden and its subsidiaries, as borrowers, and First American Bank, as senior lender; the "Sale of Senior Subordinated Notes and Warrants" between Alden, the Merit Mezzanine Fund, and McCoy for the mezzanine financing; the "Corporate Governance and Stockholder Agreement" between Alden, Merit, and Alden's stockholders, establishing agreements regarding Alden's board of directors and restrictions on the transfer of shares, among other things; and the "2008 Voting Trust Agreement," naming Adams trustee of all stock certificates of Alden common stock owned by the shareholders. Also effective June 9, 2008, Alden increased McCoy's salary from $240,000 per year to $250,000 per year.

Several relevant events occurred the following month. On July 12, 2008, Phil McCrury, Alden's corporate counsel, circulated a revised draft of an insurance-funded redemption agreement between Alden and McCoy to Adams, Youts, and McCoy asking for comments or questions.[3] McCoy responded with comments, and on July 21, 2008, McCrury circulated a revised draft of the

_____

[3]McCrury also e-mailed an insurance-funded redemption agreement applicable to Adams and his interests in Alden. The agreement was similar to McCoy's except that it set a purchase price for Adams's shares at $20 million.

6

agreement. Titled "Fourth Amended Restated Stock Redemption Agreement Between Alden Industries, Inc. and Thomas G. McCoy," Alden agreed to purchase, and McCoy's estate and spouse agreed to sell, all of McCoy's equity interests in Alden upon McCoy's death for $30 million. The agreement, which stated that "[i]t is the intent of Alden to fund Alden's obligation to purchase [McCoy's] Equity Interests with life insurance," was not subject to a term that ended before McCoy's death.

On July 22, 2008, the following day, Alden's board of directors met and elected Adams chief executive officer of Alden and vice chairman of its board.[4] The board also discussed McCoy's insurance-funded redemption agreement. The minutes from the meeting, which were approved at the next board meeting in November 2008, state in relevant part as follows:

> 10. In other board business, the board discussed the pending stock redemption agreements with Messrs. McCoy and Adams, and discussed the life insurance necessary to fund these redemption agreements. Following discussion, and upon motion duly made and seconded, the board unanimously approved the proposed stock redemption agreements and the purchase of life insurance on Messrs. McCoy and Adams.

Within a few days of the July 22, 2008 meeting, McCoy signed the insurance-funded redemption agreement that McCrury had circulated on July 21, 2008, and faxed it to McCrury. The agreement was not executed by Alden, but Alden has life insurance coverage on both McCoy and Adams.

---

[4]McCoy remained on Alden's board as the non-executive chair.

Over a year later, in October 2009, Youts contacted McCoy and told him that McCrury did not have McCoy's insurance-funded redemption agreement. According to McCoy, he was told "that the redemption agreement approved in July 2008 was not valid and binding." McCoy was "quite amazed" at the news. Adams was "surprised."

In March 2010, McCoy signed another insurance-funded redemption agreement in which Alden agreed to purchase McCoy's remaining equity interests in Alden upon his death for $30 million and to fund the purchase with life insurance on McCoy, but unlike the agreement that was circulated on July 21, 2008, and signed by McCoy, the March 2010 agreement expired in August 2010 and contained several additional stock "Transfer Restrictions." McCoy viewed Alden's actions surrounding the March 2010 agreement as an attempt to "re-trade" the agreement that he asserts had been reached in 2008, and he claims that Adams, Youts, and MacKenzie told him that he had no choice but to sign it.[5] Upon the expiration of the March 2010 agreement, McCoy signed a similar agreement in August 2010, which expired a month later. By that time, according to McCoy, Alden had offered him several options regarding his remaining interest in Alden, but none of them were consistent with what McCoy and Alden had agreed upon in 2008. Both the March and August 2010 agreements contained the following integration clause: "This Agreement also supersedes any prior

_____

[5]According to Youts, Alden went into "austerity mode and cost-containment mode" in early 2010.

8

understanding, oral agreements, or unwritten representations by or among the parties to the extent they are related in any way to the subject matter hereof."

By letter dated November 30, 2010, Alden reduced McCoy's compensation to $50,000 per year and "scaled back his benefits."

In December 2010, McCoy sued Alden for breach of contract. No part of the suit claimed that Alden had failed to comply with its obligation to pay McCoy $35 million for over half of his shares in Alden. Rather, McCoy alleged in his second amended petition that he and Alden had "entered into a comprehensive valid and binding agreement relating to McCoy's reduced involvement with Alden" that included (i) an agreement with Alden to redeem his remaining equity interest in Alden upon his death using funds from life insurance that Alden purchased on him, i.e., the insurance-funded redemption agreement, and (ii) a compensation-package agreement, which included raising his annual salary to $250,000, health benefits, use of an office and administrative assistant, and a car allowance for as long as he remained a member of Alden's board. McCoy averred that Alden had breached the comprehensive agreement by demanding that McCoy sign the March 2010 and August 2010 insurance-funded redemption agreements, stating that there was no insurance-funded redemption agreement in place, threatening to cancel the insurance policy required by his insurance-funded redemption agreement, and reducing his compensation and benefits. McCoy sought damages, specific performance, and attorneys' fees.

9

Both sides moved for summary judgment. McCoy argued that he was entitled to judgment as a matter of law on his claims for breach of the insurance-funded redemption agreement and breach of the compensation-package agreement and that the March and August 2010 "interim redemption agreements" that he signed were legally invalid. Alden argued essentially the opposite in its combined no-evidence and traditional motion—that McCoy's contract claims failed as a matter of law and were barred by integration clauses contained in the "Interim Agreements" that he signed. Alden also objected to some of McCoy's summary-judgment evidence.

The trial court denied McCoy's motion without stating any reasons but granted Alden's motion on the following specific grounds:

> 1.  Alden and Mr. McCoy did not agree that the "McCoy Compensation Package," as pleaded for by Mr. McCoy, would continue for as long as Mr. McCoy remained on Alden's board of directors;
>
> 2.  The Interim Agreements of March 2010 and August 2010 are enforceable based on the following grounds:
>
> > a.  The Alden and McCoy Interim Agreements superseded any prior agreements on the same subject, which would include the "McCoy Redemption Agreement," if such agreement was found to exist; and/or
> >
> > b.  There was sufficient legal consideration to support the Interim Agreements, even assuming the existence of the "McCoy Redemption Agreement";
>
> 3.  As of the date of the board meeting in July of 2008, Alden and McCoy had not agreed upon all material and essential terms of a Redemption Agreement;

10

4.     Based on the foregoing rulings 1, 2 and/or 3, as of the date of the July 2008 meeting of the Alden board of directors, there was no "Comprehensive Agreement" between Alden and Mr. McCoy;

5.     Based on the foregoing rulings 1, 2, 3, and/or 4, Mr. McCoy is not entitled to specific performance or injunctive relief; and

6.     Based on the foregoing rulings 1, 2, 3, and/or 4, Mr. McCoy is not entitled to recover attorney's fees.

The trial court granted several of Alden's objections to the summary-judgment evidence that McCoy filed in opposition to Alden's motion.[6]

### III. STANDARD OF REVIEW[7]

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at

[6]McCoy also sued Adams, Youts, and MacKenzie for various torts. McCoy does not appeal the trial court's grant of summary judgment in their favor on those claims.

[7]The specific grounds on which the trial court granted Alden's traditional and no-evidence motion for summary judgment coincide with arguments that Alden raised on traditional grounds. We therefore implement the standard of review for only a traditional summary judgment.

11

848. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848; *see Myrad Props., Inc. v. Lasalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009). The reviewing court should render the judgment that the trial court should have rendered. *Mann Frankfort*, 289 S.W.3d at 848.

## IV. INSURANCE-FUNDED REDEMPTION AGREEMENT

McCoy argues in his first issue that the trial court erred by determining that McCoy and Alden failed to reach a binding agreement on the material and essential terms of a long-term insurance-funded redemption agreement. He contends that the parties agreed on the essential terms as of the closing that occurred in June 2008 and, therefore, that the trial court should have found, as a matter of law, that the parties were bound to perform the agreement as set forth in the summary sheet and approved by Alden and its shareholders. McCoy further argues—apparently alternatively—that the written insurance-funded redemption agreement that he signed in July 2008 contains the essential terms

12

of the transaction and that there is at least a fact issue as to whether he and Alden agreed to its terms.

Alden responds that no comprehensive agreement existed in 2008 that included an insurance-funded redemption agreement because the parties did not agree on all of the alleged agreement's essential terms; instead, there was merely an agreement to agree in the future. According to Alden, the summary sheet had more material terms missing than were present when it came to an insurance-funded redemption plan, and the unsigned (by Alden) draft redemption agreement did not memorialize anything.

## A. Material and Essential Terms

The material terms of a contract must be agreed upon before a court can enforce a contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). So long as the parties agree on the essential terms, the agreement may leave other nonessential provisions open for future adjustment and agreement. *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972). But when an agreement leaves essential matters open for future negotiation and those negotiations are unsuccessful, the agreement is not binding upon the parties and merely constitutes an agreement to agree. *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *see Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App.—San Antonio 1996, writ denied) ("The jury may not be called upon to construe the legal effect of an agreement or to supply an essential term upon which the parties did not

13

mutually agree."). Essential terms are those that the parties would reasonably regard as vitally important elements of their bargain, an inquiry that depends primarily on the intent of the parties. *Neeley v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985). What terms are essential or material to a contract should be determined on an agreement-by-agreement basis. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221. Whether an agreement contains all essential terms, and is therefore enforceable, is a question of law. *See McCalla*, 416 S.W.3d at 418; *Bandera Cnty. v. Hollingsworth*, 419 S.W.3d 639, 645 (Tex. App.—San Antonio 2013, no pet.).

The trial court did not identify what material and essential terms Alden and McCoy did not agree upon, but we have reviewed Alden's summary-judgment motion and the parties' appellate briefs and have deduced the following: (1) terms establishing each side's primary obligations under the agreement, (2) a term establishing the duration of Alden's obligation to carry life insurance on McCoy, and (3) terms related to transfer restrictions on Alden's stock.

### 1. Primary Obligations

Directing us to McCoy's deposition testimony, Alden argues that the summary sheet is missing two key elements—it neither obligates Alden to buy McCoy's interest in Alden nor obligates McCoy's estate to sell McCoy's interest in Alden. The trial court did not determine that Alden and McCoy did not agree upon all material and essential terms of an insurance-funded redemption agreement as of June 2008, when the summary sheet was circulated. Rather, it

14

determined that they did not agree upon all material and essential terms as of July 2008, a period that covered when McCoy signed the July 2008 written agreement and the board of directors met and "approved the proposed stock redemption agreements and the purchase of life insurance on Messrs. McCoy and Adams." Therefore, we see no reason to limit our analysis to the terms contained in only the summary sheet.

The agreement that McCoy signed in July 2008 states in relevant part, "Upon the death of the Stockholder, Alden shall be obligated to purchase, and the Stockholder's estate and the Stockholder's spouse shall be obligated to sell to Alden, all of the Stockholder's Equity Interests, including any Equity Interests held in the name of the spouse of the deceased Stockholder." The agreement therefore contains terms establishing Alden's obligation to buy and McCoy's estate's obligation to sell McCoy's interest in Alden.

Alden also argued that the terms of the written insurance-funded redemption agreement that McCoy signed in July 2008 did not obligate Alden to maintain a $30 million life insurance policy. The July 2008 agreement signed by McCoy states,

> (a) **Purchase Price.** The purchase price to be paid by Alden for all of Stockholder's Equity Interests shall be Thirty Million Dollars ($30,000,000).

> (b) **Terms of Payment.** It is the intent of Alden to fund Alden's obligation to purchase the Stockholder's Equity Interests with life insurance. Alden shall pay the purchase price to the estate of the decedent within thirty (30) days after the qualification of the legal representative of such estate, or as soon thereafter as Alden

15

collects the proceeds of any applicable insurance policies on the life of the decedent.

> (c) **Life Insurance.** In the event this Agreement is not funded with insurance on the life of the Stockholder, or in the event that the insurance then in existence cannot be collected, then the obligations of Alden to purchase all of the Stockholder's Equity Interests, including any Equity Interests held in the name of the spouse of the deceased Stockholder, shall be waived, notwithstanding any other provision of this Agreement to the contrary.

When construing a contract, a court "must strive to give effect to the written expression of the parties' intent" by "read[ing] all parts of a contract together." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). This language, along with the provision set out in the preceding paragraph, reflects that while Alden has an obligation to pay McCoy's estate $30 million for McCoy's interest in Alden upon his death, that obligation is "waived" if Alden is unable to obtain, or thereafter collect on, a life insurance policy on McCoy. The logical conclusion to be drawn from these provisions is that the only way that Alden can comply with its obligation to redeem McCoy's interest is by maintaining $30 million of life insurance on McCoy. *See Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (stating that courts avoid constructions that lead to absurd results). The agreement certainly could have been clearer, but as written, we cannot conclude that it is unenforceable as a matter of law for missing a term regarding Alden's obligation to maintain life insurance on McCoy.[8]

---

[8]The summary-judgment record contains three insurance-funded redemption agreements that were later signed by Adams and became effective in

16

## 2. Duration

Alden argued in the trial court that the agreement was "silent about the duration of Alden's alleged obligation to continue carrying life insurance." Alden improperly conflates the absence of an express term with silence about duration. If the obligation is to pay McCoy's estate on his death, then in the absence of a provision limiting the agreement's term, the duration of Alden's obligation to carry insurance is for McCoy's life.[9] The interim agreements that arguably became effective in March and August 2010 both contain an express term, but the agreement that McCoy signed in July 2008 does not. This just means that the parties know how to shorten the duration of an insurance-funded redemption agreement to a period of time less than the duration of the stockholder's life. Accordingly, although the agreement that McCoy signed in July 2008 does not contain an express term, it is not silent as to its duration.

## 3. Stock Transfer Restrictions

Alden further argued that no enforceable agreement exists because there are essential terms missing that restrict McCoy's ability to transfer his shares in Alden—(i) terms that spell out what happens if McCoy later sells or transfers some or all of his shares in Alden, (ii) terms that McCoy could not sell to a

_____

November 2009, February 2010, and August 2010, respectively. Each one contains the same "It is the intent of Alden to fund" language that is contained in McCoy's agreement.

[9]This, of course, assumes that Alden does not know when McCoy is going to die.

17

competitor or to a third party that would cause Alden's subchapter S status to be lost, and (iii) terms that McCoy could not convey his stock to anyone who would thereby acquire a majority interest unless all other stockholders had the opportunity to sell on the same terms.

Article 2 of the agreement that McCoy signed in July 2008 states,

## TRANSFER RESTRICTIONS

Stockholder agrees that he will not, directly or indirectly, by and through his spouse or otherwise, sale, convey, gift, transfer or grant any interest in, whether in trust or otherwise, [] any of his Equity Interests except where the transferee of such Equity Interests (i) acknowledges the restrictions upon such Equity Interests represented by the terms and conditions of this Agreement, and (ii) agrees to be bound by them.

This restriction spells out precisely what is required for McCoy to transfer his Alden stock—the recipient must agree to the terms of the insurance-funded redemption agreement. Consequently, the provision ensures that the agreement is not rendered obsolete by a simple transfer of McCoy's interest to a third party, including a family trust.

Regarding the other stock restrictions that Alden claims are essential but missing—pertaining to Alden's subchapter S status and acquiring a majority interest in Alden—we observe that Adams signed an insurance-funded redemption agreement that apparently became effective in April 1998 and that contained many of the same provisions as McCoy's agreement, except for one— the stock-transfer restriction set out immediately above. Not only is that entire provision not included, there are *no* other provisions restricting a transfer of

18

Adams's stock in any way, including to a third party (that would cause Alden's subchapter S status to be lost) or to anyone who would thereby acquire a majority interest. Although businesses change and priorities evolve, the legal conclusion to be drawn from juxtaposing Adams's 1998 agreement with McCoy's July 2008 agreement is immediately apparent: a transfer restriction that ensures the continued effectiveness of the insurance-funded redemption agreement despite a transfer of stock is an essential term of the agreement, but transfer restrictions that affect other considerations that are not immediately relevant to the continued effectiveness of the agreement are simply not. Indeed, if over the course of an entire decade, the parties had still not included certain transfer restrictions in McCoy's July 2008 agreement, then we fail to see how those restrictions are vitally important elements of the bargain. *See Neeley*, 757 F.2d at 628. Alden directs us to Youts's affidavit testimony explaining that he and McCoy discussed the transfer restrictions before the board meeting on July 22, 2008, and that McCoy agreed to them, but while that is some evidence to support Alden's argument, it does not conclusively establish that the terms are essential.

Because the grounds upon which Alden relied to show that the alleged insurance-funded redemption agreement is unenforceable are either not missing or are not essential, the trial court erred by determining that "[a]s of the date of the board meeting in July [] 2008, Alden and McCoy had not agreed upon all material and essential terms of a Redemption Agreement." We sustain this part of McCoy's first issue.

19

## B.     Binding Agreement

Alden was not entitled to summary judgment on the ground that the alleged insurance-funded redemption agreement was unenforceable for missing essential terms, but neither was McCoy entitled to partial summary judgment on his claim that Alden breached the insurance-funded redemption agreement.

The existence of a valid, binding contract is one of the essential elements of McCoy's claim that he had to conclusively prove to be entitled to summary judgment. *See* Tex. R. Civ. P. 166a(a), (c); *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.). Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Rice*, 324 S.W.3d at 670. The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pets. denied). Therefore, whether the parties intended to enter into a binding agreement is often a question of fact. *Foreca*, 758 S.W.2d at 746. It is only when the intent of the parties is clear and unambiguous on the face of the agreement may the court determine intent as a matter of law. *Gutierrez v. Laredo ISD*, 139 S.W.3d 363, 368 (Tex. App.—San Antonio 2004, no pet.).

McCoy's summary-judgment evidence included much of the evidence that we have already detailed above—the summary sheet stating that Alden will have life insurance on McCoy to fund the repurchase of his shares, the written insurance-funded redemption agreement that McCoy signed in July 2008, and the minutes from the July 22, 2008 board meeting stating that the board had approved the proposed stock redemption agreements and the purchase of life insurance on McCoy. But the prospective language contained in the summary sheet is unquestionably ambiguous as to whether Alden agreed to purchase, and McCoy's estate agreed to sell, McCoy's remaining shares. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) (reasoning that summary judgment is improper when contract contains an ambiguity). And as for the written insurance-funded redemption agreement that McCoy signed in July 2008, it was not signed by a representative from Alden, and Youts explained that it was "a work in process" and that the motion that he made during the board meeting on July 22, 2008, was only to enable the company to negotiate and finalize the agreement.

Because the summary-judgment evidence did not clearly and unambiguously reflect the parties' intent to be bound by the agreement—either via the summary sheet or the written agreement signed by McCoy in July 2008, we hold that the trial court did not err by denying McCoy's motion for summary judgment on his claim that Alden breached the alleged insurance-funded redemption agreement. *See Foreca*, 758 S.W.2d at 746; *Gutierrez*, 139 S.W.3d at 368. We overrule this part of McCoy's first issue.

21

## V. MARCH AND AUGUST 2010 INTERIM AGREEMENTS

In his second issue, McCoy argues that the trial court erred by granting Alden summary judgment on its defense that even if there is an enforceable insurance-funded redemption agreement, it was superseded by the March and August 2010 interim agreements. McCoy contends that the integration clauses contained in the interim agreements are unenforceable because the interim agreements are not supported by consideration—McCoy received nothing of value in return for signing the interim agreements that he was not already entitled to receive under the insurance-funded redemption agreement that he claims was made earlier with Alden. Alden responds that the March and August 2010 interim agreements were supported by sufficient consideration and superseded any earlier insurance-funded redemption agreement.

Consideration is a present exchange bargained for in return for a promise and consists of benefits and detriments to the contracting parties. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). But "[w]here a party agrees to do what he is already bound to do by an original contract, there is not sufficient consideration to support a supplemental contract or modification." *Pasadena Police Officers Ass'n v. City of Pasadena*, 497 S.W.2d 388, 392–93 (Tex. Civ. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.).

During his deposition, Adams did not identify any new consideration owed McCoy under the interim agreements that he was not already entitled to receive under the insurance-funded redemption agreement that he and Alden had

22

allegedly already made. Alden contends that the interim agreements contained new consideration because they added McCoy's Family Trust as a party from whom Alden was also required to redeem shares at McCoy's death, but as we observed above, and as McCoy points out, any interests transferred to McCoy's Family Trust were already indirectly covered under the stock restriction contained in the insurance-funded redemption agreement that McCoy signed in July 2008. Moreover,

> It is essential that the parties agree on the consideration supporting the contract. It is not enough that one party to the agreement offered consideration that could be considered a fair exchange for the other party's promise if the offered consideration is not what the other party agreed to accept; rather, the consideration must be that for which the parties bargain and on which they agreed.

*Buhman v. McGaughy*, No. 14-05-01215-CV, 2007 WL 2109466, at *4 (Tex. App.—Houston [14th Dist.] July 24, 2007, pet. denied) (mem. op.) (citations omitted). Having reviewed the summary-judgment evidence, we are unable to determine whether, as a matter of law, in entering into the interim agreements with Alden, McCoy bargained to add the Family Trust as a party from whom Alden was required to redeem McCoy's shares. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 94 (5th Cir. 1995) (reasoning that "the instant issue is whether Susman bargained for and received some new consideration in exchange for accepting a lower loan amount with more restrictions, not whether he received consideration for the agreement as modified").

Alden argues alternatively that the interim agreements were supported by consideration because they represented a "temporary settlement" of the parties' dispute over the terms of the insurance-funded redemption agreement. However, while it has long been the rule that the compromise or settlement of a disputed claim is supported by a sufficient consideration, *N. Liberty Mkt. Co. v. Kelly*, 113 U.S. 199, 200, 5 S. Ct. 422, 423 (1885), viewing the evidence in the light most favorable to McCoy, we have difficulty construing the interim agreements as any kind of a "settlement" of a "dispute" surrounding McCoy's claim of a long-term insurance-funded redemption agreement with Alden. According to McCoy, he was told by Alden "that the redemption agreement approved in July 2008 was not valid and binding." He later signed the interim "replacement" agreements. Although there was some wrangling over the stock-transfer restrictions, the interim agreements appear to be less about resolving a dispute between the parties and more about Alden's desire to simply have in place (what it considered to be) an enforceable insurance-funded redemption agreement.

All of this can mean only one thing—a material fact issue exists as to whether the interim agreements contained sufficient consideration, such that they were enforceable and superseded any prior insurance-funded redemption agreement that Alden and McCoy may have already had. *See, e.g.*, *Roark*, 813 S.W.2d at 496 (holding that material issues of fact existed as to whether there was consideration for alleged contract); *Critchfield v. Smith*, 151 S.W.3d 225, 234

24

(Tex. App.—Tyler 2004, pet. denied) (same). We sustain the part of McCoy's second issue that challenges the portion of the trial court's judgment providing that the March and August 2010 interim agreements contained sufficient consideration and superseded any prior insurance-funded redemption agreement, but we overrule the part of McCoy's second issue complaining that the trial court erred by denying McCoy's motion for summary judgment on the same ground.

## VI. COMPENSATION-PACKAGE AGREEMENT

McCoy argues in his third issue that the trial court erred by granting Alden summary judgment on his claim that Alden breached its compensation-package agreement with him. The trial court agreed with Alden's argument that it was entitled to summary judgment on McCoy's compensation claim because, as a matter of law, there was no meeting of the minds between the parties that Alden would pay McCoy $250,000 per year for as long as he was a member of Alden's board of directors. McCoy contends—quite the opposite—that the evidence shows as a matter of law that the compensation agreement existed and that Alden breached it by slashing his compensation in November 2010. We have already set out the law pertaining to meeting of the minds.

McCoy stated in his affidavit that as part of the recapitalization transaction, Alden agreed to pay him compensation at the rate of $250,000 per year and to provide him with various benefits for the time period that he served on Alden's board of directors. His summary-judgment evidence included a "Payroll Change

25

Notice" that became effective on June 9, 2008—on or about when the parties to the recapitalization transaction signed closing documents—and that changed his annual salary to $250,000 per year. By letter dated November 30, 2010, Alden reduced McCoy's compensation to $50,000 per year and "scaled back his benefits." McCoy pointed to paragraph 6.7 of the "Sale of Senior Subordinated Notes and Warrants," which "provides that Alden may not 'amend any agreement with [Alden's] directors' without 'written consent of Lenders.'" McCoy argued that he was both a "Lender" and a "director" and that Alden did not obtain his consent to reduce his salary.

Alden's summary-judgment evidence included Adams's affidavit, in which he stated that he was "neither aware of nor involved in negotiating any written or oral 'compensation agreement' between Alden and McCoy, and certainly none that provided for his compensation of $250,000 annually to continue indefinitely for . . . as long as McCoy was an Alden Board member." Adams also affirmed that in reducing McCoy's salary, he made a "management decision" that was in Alden's best interest. Alden's evidence included an excerpt from its bylaws, which requires the salaries of Alden's officers to be fixed by the board of directors. Alden argued that there was no binding agreement on compensation because the board had never approved a compensation package. Alden further contended that paragraph 6.7 of the "Sale of Senior Subordinated Notes and Warrants" was no evidence of the alleged agreement or its breach and that the document that evidenced a raise in McCoy's salary to $250,000 per year

26

indicated that the salary change occurred after McCoy made a telephone call on June 20, 2008—after closing documents had been signed.

Every piece of relevant evidence is meticulously disputed by both sides. We hold that a material fact issue exists as to whether there was a meeting of the minds between the parties that Alden would pay McCoy $250,000 per year for as long as he was a member of Alden's board of directors. Accordingly, we sustain the part of McCoy's third issue that challenges the portion of the trial court's judgment providing that Alden and McCoy did not agree that the "McCoy Compensation Package" would continue for as long as McCoy remained on Alden's board of directors, but we overrule McCoy's third issue insofar as he complains that the trial court erred by denying McCoy's motion for summary judgment on the same ground. *See, e.g.*, *Harris v. Balderas*, 27 S.W.3d 71, 75–80 (Tex. App.—San Antonio 2000, pet. denied) (holding that neither side was entitled to summary judgment on existence and nonexistence of contract claim).

## VII. EVIDENTIARY RULINGS

McCoy argues in his fifth issue that the trial court abused its discretion by sustaining several of Alden's objections to his affidavits. We overrule this issue as moot because no part of our analysis relies upon any of the challenged statements contained in McCoy's affidavits. *See, e.g.*, *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., L.L.P.*, 301 S.W.3d 787, 803 (Tex. App.—Fort Worth 2009, pet. denied) (reasoning similarly).

27

## VIII. CONTINGENT RULING & CLAIMS

Ruling 4 of the trial court's order granting Alden's motion for summary judgment states, "*Based on the foregoing rulings 1, 2 and/or 3*, as of the date of the July 2008 meeting of the Alden board of directors, there was no 'Comprehensive Agreement' between Alden and Mr. McCoy." [Emphasis added.] "[R]ulings 1, 2 and/or 3" refer to the trial court's rulings granting Alden summary judgment on McCoy's contract claims and on Alden's defense involving the March and August 2010 interim agreements. Having sustained in part McCoy's first, second, and third issues, which challenge the trial court's rulings 1, 2, and 3, we sustain the final part of McCoy's first issue that challenges ruling 4 of the trial court's order granting Alden's motion for summary judgment.

Finally, McCoy argues in his fourth issue that the trial court erred by granting Alden summary judgment on his claims for specific performance, injunctive relief, and attorneys' fees. Having sustained in part McCoy's first, second, and third issues, we sustain McCoy's fourth issue to the extent he argues that the trial court erred by granting Alden summary judgment on those claims.

## IX. CONCLUSION

The trial court erred by granting Alden summary judgment but not by denying McCoy partial summary judgment. We therefore affirm the portion of the trial court's judgment denying McCoy's motion for partial summary judgment,

28

reverse the portion of the trial court's judgment granting Alden summary judgment, and remand this cause to the trial court for further proceedings.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MEIER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

DELIVERED:  July 9, 2015