

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00053-CV

_____

J. CURT LUCAS AND INVENIAS PARTNERS LLC, Appellants

V.

CYNDI RAMIREZ RYAN, Appellee

On Appeal from County Court at Law No. 2
Denton County, Texas
Trial Court No. CV-2016-02101

Before Kerr and Pittman, JJ., and Gonzalez, J.[1]
Memorandum Opinion by Justice Kerr

---

[1]The Honorable Ruben Gonzalez, Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h).

## MEMORANDUM OPINION

Following a bench trial, the trial court rendered a $43,000 judgment for Cyndi Ramirez Ryan and against J. Curt Lucas and Invenias Partners, LLC. On appeal, Lucas (an Illinois resident) and Invenias (an Illinois company) argue that the trial court lacked personal jurisdiction over them and that the evidence is legally and factually insufficient to support the trial court's judgment. We will affirm in part, reverse and render in part, and reverse and remand in part.

### I.
### Background

Texas resident Ryan is a highly experienced executive-search-and-talent-advisory-services professional with 20 years' experience in human resources in the healthcare field. In 2013 or 2014, Lucas—an Illinois resident and the managing partner and chairman of Invenias, a Chicago-based healthcare executive-search firm—contacted Ryan about a position as a chief human-resources officer with one of his firm's clients. Ryan did not get the job, but she worked with Lucas to explore other employment opportunities. Ryan ultimately chose not "to move forward with any of [those] roles," but Lucas occasionally contacted her about other positions.

In early July 2015, Ryan sent an email announcement to her professional contacts—including Lucas—that she had left her job at Baylor Scott & White Health to start Más Talent, LLC, a human-resources consulting firm that specializes in

2

diversity and inclusion.[2] Lucas responded and suggested that they meet to discuss the possibility of working together. To that end, Ryan traveled to Chicago in late July 2015 to meet with him to discuss the consulting services that she and Más Talent could provide to Lucas and Invenias.

During their Chicago meeting, Lucas gave Ryan a company laptop computer, access to Invenias's database, business cards, and an Invenias email address. Lucas also gave Ryan a copy of Invenias's "Executive Search and Consulting Guide Partner Edition," which outlined and explained the executive-search process, a partner's responsibilities, and the partner-compensation structure. Ryan rejected the compensation model in the guide, but the parties continued compensation negotiations.

On September 23, 2015, Scripps Health, a healthcare system in San Diego, California, retained Invenias to conduct a search for a Vice President, Chief Audit and Compliance. Invenias's search fee, which was based on the compensation estimate for the position, was $140,834, and Scripps agreed to reimburse Invenias's expenses.

A month later, Lucas called Ryan to ask her to help with the search. Ryan emailed Lucas a proposed compensation structure. Lucas responded with the following proposal: (1) 39% of the executive-search fee would be allocated to Invenias's overhead and expenses; (2) Ryan and Lucas would split the remaining 61%, provided that they "equally split all execution responsibilities"; and (3) the client

---

[2]Más Talent is a Texas limited-liability company.

would pay all search-related expenses. Ryan accepted Lucas's offer and asked him if he had an "independent contractor agreement or letter to formalize" their agreement. Lucas agreed to send Ryan an independent-contractor agreement outlining what they had discussed. Five days later, Ryan emailed Lucas to remind him to send her the independent-contractor agreement; Lucas responded that he was still working on it.

In the meantime, Ryan and Lucas began working together on the Scripps search. Ryan participated in a conference call, and she and Lucas made travel plans to meet with Scripps executives in San Diego. In early November, Ryan and Lucas spent three days in San Diego meeting with Scripps executives and interviewing candidates. During the trip, Ryan learned that the executive-search fee for the project had increased to $148,005.

While in San Diego, Ryan asked Lucas if he had "drawn up" an independent-contractor agreement. Lucas admitted that he had not and asked Ryan if she had any sample contracts that she had used. Ryan said that she did and agreed to send samples to him. A few days after the San Diego trip, Ryan emailed Lucas two sample independent-contractor agreements and told him to "feel free to edit or use what works for you." Even though Lucas thanked Ryan for sending them, he never provided her with a proposed independent-contractor agreement, and the parties never signed a written contract memorializing their agreement.

The day after Ryan sent Lucas the sample contracts, she emailed him about dividing up interviews of additional candidates for the Scripps position. Lucas

4

assigned Ryan two candidates to interview. Ryan conducted those interviews by videoconference and wrote summaries for Lucas.

The same day Ryan contacted Lucas about the candidate interviews, she emailed him an invoice from Más Talent for $15,047.18, the first third of her 30.5% fee.[3] Lucas refused to pay the invoice because, according to him, Ryan had failed to equally split the execution responsibilities for the Scripps search. Lucas and Invenias never paid Ryan for any of her work.

Ryan and Más Talent sued Lucas and Invenias for breach of contract and, alternatively, for promissory estoppel and quantum meruit. In support of personal jurisdiction over Lucas and Invenias, Ryan and Más Talent alleged in relevant part that Texas had specific jurisdiction over Lucas and Invenias because they had conducted business in Texas by

- entering into a contract with Ryan and Más Talent that was performable in whole or in part in Texas;

- requesting and using Ryan's and Más Talent's services to expand Lucas's and Invenias's Texas operations, to reap profits and benefits, and to solicit and serve Texas clients;

- recruiting Texas residents directly or through an intermediary located in Texas for employment inside or outside of Texas;

- using Ryan's name and business expertise in advertising and promotional materials without her consent; and

_____

[3]The invoice did not include Ryan's Scripps-related expenses, but Invenias did reimburse her for them.

- falsely claiming on the Invenias website that Ryan's home was Invenias's Texas office and that Ryan's personal cellphone number was the contact number for that office.

Ryan and Más Talent further alleged that other than the San Diego trip, she performed the majority of her services for Invenias in Texas.

Lucas and Invenias specially appeared, challenging both general and specific jurisdiction. *See* Tex. R. Civ. P. 120a. After a non-evidentiary hearing, the trial court found that it had specific jurisdiction over Lucas and Invenias and denied their special appearances. No findings of fact and conclusions of law were requested or filed, and Lucas and Invenias did not file an interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(7) (permitting an interlocutory appeal from an order granting or denying a special appearance).

Ryan and Más Talent later amended their petition to add a negligent-misrepresentation claim against Lucas. After a day-long bench trial, the trial court entered judgment for Ryan against Lucas and Invenias for $43,000.[4] No findings of fact and conclusions of law were requested or filed. *See* Tex. R. Civ. P. 296, 297. Lucas and Invenias have appealed, challenging the trial court's order denying their special appearances (issue 5) and the sufficiency of the evidence supporting the judgment (issues 1–4).

---

[4]At trial, Lucas testified that he negotiated with Ryan, not Más Talent. Más Talent did not file a notice of appeal, and Ryan does not complain that the trial court erred by not entering judgment for Más Talent.

## II.
## Lucas's and Invenias's Special Appearances

Because it is potentially dispositive of this appeal, we start by addressing Lucas and Invenias's fifth issue, which challenges the trial court's exercise of personal jurisdiction over them.[5] Invenias contends its Texas contacts were not purposeful and that Ryan's claims did not arise from those contacts. Lucas asserts that because all of his Texas contacts were on Invenias's behalf, the fiduciary-shield doctrine protects him from the trial court's exercise of personal jurisdiction.

## A. Applicable Law

### 1. Personal-jurisdiction principles

A Texas court has personal jurisdiction over a nonresident defendant when the Texas long-arm statute permits the exercise of such jurisdiction and the exercise of

---

[5]Even though Ryan does not complain that Lucas and Invenias waived their right to challenge personal jurisdiction by not filing an interlocutory appeal from the trial court's order denying their special appearances, we note that the majority of the courts of appeals addressing this issue have held that a party does not waive its right to appellate review of an order granting or denying a special appearance by failing to take an interlocutory appeal from that order. *See, e.g.*, *Southampton Ltd. v. Four Horsemen Auto Grp., Inc.*, No. 05-14-01415-CV, 2016 WL 3964731, at *3 (Tex. App.—Dallas July 20, 2016, no pet.) (mem. op.); *DeWolf v. Kohler*, 452 S.W.3d 373, 383–84 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 866–67 (Tex. App.—Austin 2008, no pet.); *Canyon (Austl.) Pty., Ltd. v. Maersk Contractors, Pty., Ltd.*, No. 08-00-00248-CV, 2002 WL 997738, at *4 (Tex. App.—El Paso May 16, 2002, pet. denied) (not designated for publication); *see also Hernandez v. Ebrom*, 289 S.W.3d 316, 327 (Tex. 2009) (Jefferson, C.J., dissenting) ("The prevailing view is that an order granting or denying a special appearance may be challenged after final judgment."). *But see Matis v. Golden*, 228 S.W.3d 301, 305 (Tex. App.—Waco 2007, no pet.) (holding that challenge to trial court's order denying defendant's special appearance, raised for first time on appeal from final judgment, was untimely).

jurisdiction is consistent with federal and state constitutional due-process guarantees. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016) (citing *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013)), *cert. denied* 137 S. Ct. 2290 (2017). The Texas long-arm statute allows a Texas court to exercise jurisdiction over a nonresident defendant who "does business" in Texas, which includes contracting with a Texas resident for performance in whole or in part in Texas and recruiting Texas residents for employment inside or outside the state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1), (3). Because the long-arm statute reaches "as far as the federal constitutional requirements for due process will allow," a Texas court may exercise personal jurisdiction over a nonresident so long as doing so "comports with federal due process limitations." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010) (quoting *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)). Federal due process is satisfied when (1) the defendant has established minimum contacts with the state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *TV Azteca*, 490 S.W.3d at 36.

A nonresident defendant "establishes minimum contacts with a forum when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Moncrief Oil*, 414 S.W.3d at 150 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Three principles govern our purposeful-availment analysis: (1) only the

defendant's contacts with Texas are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be purposeful and not random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of Texas's jurisdiction so that it impliedly consents to suit here. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 886 (Tex. 2017) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco*, 278 S.W.3d at 338 (quoting *Am. Type Culture Collection*, 83 S.W.3d at 806).

Minimum contacts can give rise to either specific or general jurisdiction. *TV Azteca*, 490 S.W.3d at 37. Here, Ryan contends (and the trial court agreed) that Texas has specific jurisdiction over Lucas and Invenias.[6] A trial court may exercise specific jurisdiction over a nonresident defendant only if the suit arises from or relates to the defendant's forum contacts. *Id.*; *see Moncrief Oil*, 414 S.W.3d at 150 ("[S]pecific jurisdiction exists when the cause of action arises from or is related to purposeful activities in the state."); *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991) (explaining that a specific-jurisdiction analysis requires review of the "relationship among the defendant, the forum[,] and the

---

[6]We therefore will not address Lucas's and Invenias's appellate arguments against general jurisdiction.

litigation"). For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007). Specific jurisdiction requires us to analyze a nonresident defendant's contacts on a claim-by-claim basis unless all claims arise from the same forum contacts. *Moncrief Oil*, 414 S.W.3d at 150–51 (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006)).

But even when a nonresident has established minimum contacts with Texas, due process permits Texas to assert personal jurisdiction over the nonresident only if doing so comports with traditional notions of fair play and substantial justice. *TV Azteca*, 490 S.W.3d at 55. Typically, "[w]hen a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts." *Id.* (quoting *Spir Star*, 310 S.W.3d at 872). Thus, "[i]f a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Id.* (quoting *Moncrief Oil*, 414 S.W.3d at 154–55).

### 2. *The parties' shifting trial-court burdens and our standard of review*

In the trial court, the plaintiff has the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). Once the

10

plaintiff has done so, the burden shifts to the defendant to negate all potential bases for personal jurisdiction pleaded by the plaintiff. *Id.* "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.*

The defendant can negate jurisdiction on a factual basis by presenting evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations; the plaintiff risks dismissal of its suit if it does not present the trial court with evidence affirming its jurisdictional allegations and establishing personal jurisdiction over the defendant. *Id.* at 659. The defendant can also negate jurisdiction on a legal basis by showing that even if the plaintiff's alleged jurisdictional facts are true, (1) those facts are not sufficient to establish jurisdiction, (2) the defendant's Texas contacts fall short of purposeful availment, (3) the claims do not arise from the defendant's Texas contacts, or (4) exercising jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Id.*

In reviewing a trial court's order denying a special appearance, we review the trial court's factual findings—express or implied—for legal and factual sufficiency and its legal conclusions de novo because whether a trial court has personal jurisdiction over a defendant is a legal question. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794–95 (Tex. 2002). When, as here, the trial court does not issue findings and conclusions with its special-appearance ruling, we infer all facts that are necessary to support the judgment and are supported by the evidence. *Id.* at 794.

11

**B. Analysis**

As an initial matter, we note that when Lucas and Invenias specially appeared, Ryan and Más Talent had not yet pleaded their negligent-misrepresentation claim against Lucas. Thus, we will not evaluate Lucas's and Invenias's jurisdictional contacts as to that claim. We also note that the special-appearance evidence differs slightly from the evidence developed at trial, but we will review the trial court's special-appearance ruling based on the live pleadings and the evidence on file at the time the trial court made its personal-jurisdiction ruling. *See* Tex. R. Civ. P. 120a(3). Finally, in reviewing this ruling, we consider only the quality and nature of Lucas's and Invenias's Texas contacts; the merits of Ryan and Más Talent's claims are irrelevant. *See Rubinstein v. Lucchese, Inc.*, 497 S.W.3d 615, 624 (Tex. App.—Fort Worth 2016, no pet.) ("The issue in question is whether the trial court can exercise personal jurisdiction over Rubinstein given his contacts with Texas, not whether Lucchese has a viable cause of action against him. Personal jurisdiction may exist even if the plaintiff ultimately loses his suit or has less than a certain claim.").

### 1. *Ryan and Más Talent's Pleadings*

Without any argument or citing to any authority, Lucas and Invenias state in passing that Ryan and Más Talent did not plead sufficient contacts with Texas. We have reviewed their pleadings and conclude that Ryan and Más Talent satisfied their initial burden to plead sufficient allegations to bring Lucas and Invenias within the Texas long-arm statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1), (3) (stating

that acts constituting doing business include contracting with a Texas resident for performance in whole or in part in Texas and recruiting Texas residents for employment inside or outside the state); *see also OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *6 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.); *Griffith Techs, Inc. v. Packers Plus Energy Servs. (USA), Inc.*, No. 01-17-00097-CV, 2017 WL 6759200, at *3 (Tex. App.—Houston [1st Dist.] Dec. 28, 2017, no pet.) (mem. op.). Because Ryan and Más Talent met their initial pleading burden, the burden shifted to Lucas and Invenias to negate all potential bases for personal jurisdiction that Ryan and Más Talent pleaded. *See Kelly*, 301 S.W.3d at 658.

### 2. The special-appearance evidence

According to Lucas's and Invenias's special-appearance evidence,

- Lucas is an Illinois resident.

- Invenias is incorporated in Illinois and has its principal place of business there.

- Invenias has never had an office in Texas.

- Invenias employs Lucas, and Lucas is its managing partner and chairman.

- Any contacts Lucas has had with Texas have been on behalf of Invenias or his previous employers.

- All jurisdictional grounds Ryan and Más Talent alleged against Lucas are false or were "solely and exclusively related" to actions Lucas took on behalf of Invenias or his previous employers.

- Ryan approached and solicited Invenias for a business opportunity. Invenias did not solicit or approach Ryan.

13

- Neither Lucas nor Invenias has conducted business in Texas.

- Neither Lucas nor Invenias entered into a contract with Ryan and Más Talent performable in whole or in part in Texas.

- Invenias anticipated entering into an agreement with Ryan and that Ryan would be Invenias's "Texas presence" but "the relationship never culminated, including through any sort of written agreement/contract."

- Invenias never "successfully used" Ryan's and Más Talent's services to expand its Texas business operations, to reap profits or benefits, or to solicit or serve Texas clients.

- The parties never entered into a written agreement because they could not agree on its terms.

- Invenias never falsely claimed on its website that its Texas office was located at Ryan's home in Texas or listed her cellphone number as its contact number. Invenias anticipated entering into a contract with Ryan and that Ryan's address would be Invenias's Texas address. Toward that end, Invenias and Ryan agreed to allow the other to use their information on the other's website.

- Ryan's interaction with Invenias consisted of emails and telephone calls, but the majority of their interactions were in Illinois and California when Ryan traveled to Chicago to learn about Invenias and when she traveled to San Diego to observe Invenias's services with a client.

- Invenias has never used Ryan's name and business expertise in advertising and promotional materials without her consent. Invenias prepared materials based on an anticipated contract between Invenias and Ryan.

- Neither Lucas nor Invenias has recruited any Texas residents directly or through an intermediary located in Texas for employment inside or outside of Texas.

- Invenias never asked Ryan to perform services for it in Texas.

- Neither Lucas nor Invenias made any income, revenue, or profit from their relationship with Ryan and Más Talent.

14

According to Ryan and Más Talent's special-appearance evidence,

- Ryan is a highly experienced human-resources and executive-search-and-talent-advisory-services professional in the healthcare field.

- Ryan owns Más Talent.

- Más Talent's principal place of business is at Ryan's home in Carrolton, Texas.

- With the exception of the business trip to San Diego, Ryan performed the majority of her services for Invenias in Texas.

- Lucas was Ryan's primary contact at Invenias.

- In early July 2015, Lucas contacted Ryan in Texas and "began recruiting [her] through phone and email discussions about having [her] provide consulting services to [Lucas and Invenias]."

- Lucas claimed that he and Invenias were expanding into the Texas market and "were interested in [Ryan's] business expertise, extensive professional contacts, and reputation to help drive [the] Texas expansion."

- In late July 2015, Ryan went to Chicago to meet with Lucas to discuss the consulting services she could provide to him and Invenias through her company, Más Talent.

- From August through October 2015, Lucas and Invenias "continued their recruitment and discussions about having [Ryan and Más Talent] provide consulting services to [Lucas and Invenias]."

- On October 21, 2015, Lucas called Ryan to ask her to help with a search for an executive position with Scripps Health and asked her to participate in a conference call to discuss potential candidates "sourced" by Invenias's staff. Lucas also asked Ryan to join him in San Diego to meet with Scripps Health executives regarding the search. Later that day, Lucas emailed Ryan and asked her permission to put her biography on Invenias's website. Ryan emailed Lucas her permission along with her proposed compensation terms.

15

- On October 22, Lucas responded with the following compensation terms: 39% of the executive-search fee would go to Invenias for its overhead expenses and Lucas and Ryan (and Más Talent) would split the remaining 61% equally, "provided [they] also equally split all execution responsibilities." The executive-search fee for the Scripps search was $148,005. Using the proposed compensation formula, after Invenias was paid for overhead, Lucas and Ryan (and Más Talent) would each receive about $45,000.

- That same day, Ryan participated in the conference call with Lucas and Invenias from her home in Texas. She also "reviewed the Scripps' request; potential approaches; backgrounds to target in the candidate database; and reporting relationships."

- On October 23, Ryan sent an email to Lucas accepting his proposed compensation terms. Her portion was to be paid in three installments at her home in Texas. Lucas also told her that any new business that she generated would "pay out at 40%."

- Lucas and Invenias provided Ryan with an Invenias email address, created "email stationery" stating that she was the Managing Partner of Invenias's Dallas Office, and provided her with business cards.

- In furtherance of the alleged contract, Ryan performed the following services: participated in an initial "'game planning session' with [Invenias] to clearly define the ideal candidate profile" for the Scripps search; spent three days in San Diego meeting with Scripps executives regarding the search and meeting and interviewing candidates; prepared candidate assessments; provided feedback to Scripps executives; emailed Lucas from her home in Texas requesting "his feedback on 'how to split and concur to interview [additional] candidates'"; conducted videoconferences with two potential candidates; narrowed candidates to present to Scripps; made recommendations on interviewed candidates; communicated with candidates "on status and potential next steps"; sent and received numerous emails and participated in numerous conference and telephone calls; presented a progress report to Scripps; discussed "next steps" with Scripps and Lucas; and prepared a report summarizing the final candidate interview.

- On November 11, Ryan emailed Lucas and Invenias an invoice from Más Talent for the first installment for the Scripps search (about $15,000), payable within 30 days in Texas.

16

- Lucas and Invenias refused to pay the invoice, stating, "Cyndi, there is absolutely no way I can pay you $15,000 for a trip to San Diego (which was paid for) and interviewing a couple of candidates. . . . If you will remember, I said we needed both to take an equal responsibility for the search, and that has [not] happened."

- Invenias and Lucas retained all the proceeds from the Scripps project. Despite Ryan's repeated demands, Lucas and Invenias refused to pay the invoice and never compensated Ryan for any of her work.

- On its website and in its advertising and promotional materials, Invenias listed Ryan's home address as its Texas office and her personal cellphone number as its Texas contact number.

### 3. Invenias's Texas contacts

Invenias contends that it lacked minimum contacts with Texas because its only Texas contacts were emails and telephone calls to Ryan and that Ryan could have performed her contractual duties anywhere because the alleged contract did not require her to perform her work in Texas. *See, e.g.*, *Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc.*, 80 S.W.3d 723, 730 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("We do not believe that initiating contract discussions with a Texas resident, and subsequently entering into a contract, in addition to making payment in Texas, are sufficient contacts with Texas when the entire substance of the contract is performed outside the state."). Invenias also argues that Ryan's claims do not arise from or relate to its Texas contacts, but arise from and relate to its contacts with Illinois and California. *See Moki Mac*, 221 S.W.3d at 579 ("[P]urposeful availment alone will not support an exercise of specific jurisdiction. . . . unless the defendant's liability arises from or relates to the forum contacts.").

17

Standing alone, entering into a contract with a Texas resident does not necessarily establish minimum contacts sufficient to support personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79, 105 S. Ct. 2174, 2185 (1985); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 281 (Tex. App.—Houston [14th Dist.] 2009, no pet.). But a contract can establish sufficient minimum contacts when considered against a backdrop of "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Citrin Holdings*, 305 S.W.3d at 281 (quoting *Burger King*, 471 U.S. at 479, 105 S. Ct. at 2185). The contract's place of performance is an important consideration. *Id.*; *Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 283 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1). A contract calling for performance in Texas can support personal jurisdiction. *Citrin Holdings*, 305 S.W.3d at 281. Further, "[i]t is reasonable to subject a nonresident defendant to personal jurisdiction in Texas in connection with litigation arising from a contract specifically designed to benefit from the skills of a Texas resident who performs contractual obligations in Texas." *Id.*

The purposeful-availment doctrine "recognizes that a defendant can make choices to avoid benefitting from activities in Texas." *Nogle & Black Aviation*, 290 S.W.3d at 283 (citing *Moki Mac*, 221 S.W.3d at 575 and *Michiana Easy Livin' Country*, 168 S.W.3d at 785). Here, Lucas and Invenias specifically chose to use, and initiated contact with, a Texas resident for her skill and expertise. Ryan is a highly

18

experienced professional with specialized knowledge in the healthcare human-resources field. According to Ryan,[7] Lucas initiated email and telephone contact with her in Texas in July 2015 to recruit her to provide consulting services to Invenias and Lucas. Invenias and Lucas sought to take advantage of Ryan's experience, contacts, and reputation to drive Invenias's and Lucas's expansion into Texas. Toward that goal and anticipating a contract, Invenias represented on its website and in its promotional and advertising materials that Ryan was part of the company and that her home address was its Texas office and her personal telephone number was its Texas number.

Lucas contacted Ryan again in October 2015, this time to specifically ask for her help on the Scripps project. The parties entered into a contract under which Invenias, Lucas, and Ryan would split the executive-search fee. While the agreement did not specify that Ryan would perform the contract in Texas, Invenias and Lucas knew that she worked out of her home in Texas because Invenias had listed her home address as its Texas office. And aside from the California trip, Ryan performed her work under the contract in Texas. Ryan and Más Talent demanded payment in Texas, and Invenias and Lucas refused to pay her here.

Under these facts, Invenias and Lucas could have reasonably anticipated litigation in Texas arising from and in connection with the performance of a contract

[7]As noted, because the trial court did not make fact findings, we must infer all facts necessary to support the judgment that are supported by the evidence. *See BMC Software*, 83 S.W.3d at 794.

in Texas by a Texas resident with whom they chose to contract. *See Citrin*, 305 S.W.3d at 286; *see also Retamco*, 278 S.W.3d at 340 ("[W]e have found that, even in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas."). Accordingly, we hold that the evidence supports the trial court's implicit conclusion that Invenias purposely availed itself of conducting activities in Texas and that Ryan and Más Talent's claims arise from or relate to those purposeful contacts.

### 4. The fiduciary-shield doctrine

Lucas asserts that because all his contacts with Texas were performed in his capacity as an Invenias officer, the fiduciary-shield doctrine protects him from the exercise of specific jurisdiction. "Under the fiduciary shield doctrine, a nonresident officer or employee may not be subject to personal jurisdiction when all of his contacts with the forum state were made on behalf of his corporation or employer." *Ren v. ANU Res., LLC*, 502 S.W.3d 840, 849 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 650–51(Tex. App.—Fort Worth 2003, pet. denied); *see also Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982) ("Absent some allegation of a specific act in Texas, or one with reasonably foreseeable consequences within this state's borders, a nonresident employee of a foreign corporation cannot be sued in Texas simply because his or her employer solicits business here."). But this doctrine has its limits. It "does not protect

a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable." *Nw. Cattle Feeders, LLC v. O'Connell*, 554 S.W.3d 711, 725 (Tex. App.—Fort Worth 2018, pet. denied) (quoting *Steamboat Capital Mgmt. v. Lowry*, No. 01-16-00956-CV, 2017 WL 5623414, at *10 (Tex. App.—Houston [1st Dist.] Nov. 21, 2017, no pet.) (mem. op.)). And some courts (including this one) have restricted its application to attempts to exercise general jurisdiction over a nonresident defendant. *See Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex. App.—Dallas 2012, no pet.); *Ennis v. Louisea*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.); *SITQ E.U.*, 111 S.W.3d at 651. *But see Stull v. LaPlant*, 411 S.W.3d 129, 138 (Tex. App.—Dallas 2013, no pet.) (holding that "even if a plaintiff asserts only specific jurisdiction regarding an alleged breach of contract against a non-resident agent of the contracting party, the agent's contacts with Texas in furtherance of the principal's business are attributable only to the employer, not to the agent, because the fiduciary shield doctrine applies").

Here, however, the fiduciary-shield doctrine does not apply because Ryan and Más Talent have alleged claims against Lucas in his individual capacity. As pleaded, Ryan and Más Talent's breach-of-contract, quantum-meruit, and promissory-estoppel claims all relate to the alleged agreements and promises that both Invenias and Lucas made. Despite Lucas's assertion in his affidavit that all his Texas contacts were on Invenias's behalf, Ryan averred in her special-appearance affidavit that *both* Lucas and Invenias sought her out to take advantage of her experience, contacts, and reputation

21

to expand their business in Texas. Additionally, according to Ryan, both Lucas and Invenias were parties to the alleged contract, both made promises to her, both breached the agreement, and both retained the benefits of her work without compensating her. *See Hoagland v. Butcher*, 474 S.W.3d 802, 814–15, 814 n.10 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding that the trial court could exercise specific jurisdiction over partner as individual when plaintiff specifically alleged that partner entered into agreement with him in individual capacity). *But cf. City of White Settlement v. Emmons*, No. 02-17-00358-CV, 2018 WL 4625823, at *16 (Tex. App.—Fort Worth Sept. 27, 2018, pet. denied) (mem. op.) ("Because specific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum, and as to the breach of contract and promissory estoppel claims the City Claimants do not allege that Emmons entered into a contract with them or made promises in his individual capacity, we hold that the evidence does not support the exercise of specific jurisdiction over Emmons with respect to these two claims."); *Stull*, 411 S.W.3d at 138 (concluding that trial court did not have specific jurisdiction over breach-of-contract claim against individuals whose sole contacts were in the their capacities at corporate agents). We conclude that the evidence supports the trial court's implicit conclusion that the fiduciary-shield doctrine does not protect Lucas from the exercise of specific jurisdiction.

### 5. *Fair play and substantial justice*

Lucas and Invenias do not assert or argue on appeal that the trial court's implicit determination to exercise jurisdiction over them would violate traditional notions of fair play and substantial justice. *See* Tex. R. App. P. 38.1(f), (i). Accordingly, we will not address this aspect of personal jurisdiction, and we will affirm the trial court's order denying Lucas's and Invenias's special appearances.

We overrule Lucas and Invenias's fifth issue.

## III.
## The Bench Trial

In their first four issues, Lucas and Invenias challenge the legal and factual sufficiency of the evidence to support the trial court's judgment.

### A. Standards of review

As noted, findings and conclusions were neither requested nor filed. In a bench trial in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.*; *Liberty Mut. Ins. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.). We must affirm the

judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011); *see also Liberty Mut.*, 295 S.W.3d at 777.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. The evidence

Both Ryan and Lucas testified at trial, each offering different perspectives of the Scripps search. Ryan claims they had a contract regarding the search; Lucas denies it.

### 1. *Lucas is impressed with Ryan, and at his invitation, she travels to Chicago to meet with him.*

Ryan, an experienced professional, testified that she is familiar with executive searches in the healthcare field. Lucas, however, testified that Ryan had "zero experience in executive search." But he thought she could do "very well in [the] business if she were willing to learn it." In his opinion, Ryan's personality, presence, professionalism, communication skills, and work ethic "could provide some value to [Invenias] and herself if this was a business that she was really interested in pursuing."

During their Chicago meeting in July 2015, Ryan and Lucas were unable to reach an agreement regarding her relationship with Invenias. Ryan admitted that she "did not necessarily have a whole lot of interest in executive search." But she knew that her "expertise . . . in talent management and diversity and inclusion" interested Lucas because diversity and inclusion were becoming more important in the healthcare field. Ryan also did not want to become an Invenias employee because she wanted to grow her own business and because Invenias's compensation model would have required her to bring in new clients.

Even though they did not come to terms about their relationship, Lucas gave Ryan a company computer, business cards, and Invenias's "Executive Search and

Consulting Guide Partner Edition." Along with a nondisclosure agreement for Ryan to sign, Lucas also gave her access to Invenias's database, which he described as Invenias's "lifeblood." Although Lucas testified that he gave Ryan database access with the understanding that she would sign the nondisclosure agreement, she left Chicago without signing it because, according to her, the parties had not agreed on compensation. Ryan testified that Lucas told her not to worry about signing the nondisclosure agreement then because he trusted her. Lucas admitted that he did not cut off Ryan's database access because he believed that she would eventually sign the nondisclosure agreement.

### 2. Lucas reaches out to Ryan.

Shortly after Scripps retained Invenias to conduct the audit-and-compliance search in September 2015, Lucas went to San Diego to meet with Scripps executives about the search. In mid-to-late October, Lucas called Ryan about working with him on the search and invited her to travel to San Diego with him on the project. Because Ryan was familiar with Scripps's chief human-resources officer and "had some availability," she was interested in working on the project and began discussing with Lucas a different compensation model than he had proposed in Chicago.

On October 21, while Ryan and Lucas were negotiating compensation, Lucas sent the following email to his Invenias team and Ryan:

> All, we need to begin sourcing for the Corporate Vice President/Chief Audit and Compliance Officer search for Scripps. Cyndi Ryan will be working with us on this assignment. Please divide sourcing

26

responsibilities and begin your research. We will conduct a conference call tomorrow with Cyndi . . . to discuss in more detail.

The next day, Ryan, Lucas, and the Invenias team had a conference call regarding the search. Ryan sent Lucas an email to follow up on her compensation proposal, and he responded with the following offer:

> Yes. Based on the firm's overhead and expenses (staff salaries, database licensing fees, office rent and expenses, media expenses, insurance, taxes, etc.), which, on average account for 39% of professional fees, leaves 61% in retained earnings. Provided expenses remain constant, I would be willing to split the 61% with you, or 30.5% of the professional fee, provided we also equally split all execution responsibilities. All expenses related to each search will be paid for by the client.

> For instance, the total professional fee for the Scripps Chief Compliance Officer search is $140,834, paid in three installments. The 30.5% paid to you would equate to a total of about $43,000. Our search fees have averaged about $150,000 per assignment. Should you be equally involved in 10 searches per year, you would earn approximately $457,500 annually. Let me know if this sounds acceptable. Thanks.

Ryan responded:

> Based on what you've shared, I think it's a fair arrangement and am fine moving forward. Do you have some type of independent contractor agreement or letter to formalize?

> I'm sure we can talk in San Diego further, but would be interested to hear more about how to divide the responsibilities and how you prefer to approach. Excited to launch!

Lucas responded: "Awesome!! Yes, I will share with you an IC agreement that will outline what we have discussed. I plan to travel to SD on Wed 11/4, returning late Friday afternoon, 11/6. Sylene is out today, but she will work with you next Monday

to book your travel." Ryan emailed Lucas a few days later to remind him to send her the "IC agreement," and he responded, "Will do; still working on. Thanks."

### 3. Ryan thinks they have a contract, but unbeknownst to her, Lucas doesn't.

Ryan testified that Lucas's email offer and her acceptance of that offer was their contract for the audit-and-compliance search. At trial, Lucas denied that the email chain established a written contract among him, Invenias, and Ryan. Lucas admitted that he made an offer to Ryan but contended that the offer was for a future search because, according to Lucas, the audit-and-compliance search was over halfway complete at that time. From Lucas's perspective, Ryan was only going to be observing and learning from the audit-and-compliance search. He claimed that the "for instance" paragraph was an example of how the fee would be divided if they entered into a contract in the future and was not an offer to Ryan to work on the audit-and-compliance search with him. Ryan, however, thought she was part of that search. She denied that the "for instance" paragraph was merely an example of future fee-splitting.

Lucas also testified that from his perspective, the "deal wasn't done" because he and Ryan were still in the process of negotiating, and he wanted to put their agreement in writing as he does with all his independent contractors. According to him, the email chain lacked all the terms that would be essential for him to enter into a contract. Lucas testified that the "deal" never happened because Ryan refused to sign a nondisclosure agreement, which he considers "huge" and requires of all

28

Invenias employees and independent contractors. Lucas claimed he never would have entered into a contract with Ryan without a corresponding nondisclosure agreement. Lucas admitted that there were no written requests to Ryan about signing the nondisclosure agreement but claimed that he and his assistant repeatedly asked her to sign it. Ryan denied knowing that Invenias and Lucas required a nondisclosure agreement as a condition of doing business with them.

### 4. Still thinking she had a contract, Ryan travels to San Diego to work on the search.

In early November 2015, Lucas and Ryan spent three days in San Diego working on the audit-and-compliance search. According to Ryan, she and Lucas met with candidates and met with Scripps executives to talk about "specifics of the role for the audit and compliance officer role," to identify ideal candidates, to review preliminary candidates, and to clarify what Scripps was looking for. Ryan testified that over the course of the trip, she met with six to ten executives and three or four candidates.

Ryan admitted that Lucas took the lead during the interviews in San Diego, but she maintained that she assisted him in asking questions. She testified that she took notes during the interviews and gave Lucas her notes and thoughts on the candidates whom she interviewed. During the trip, Ryan and Lucas interviewed the person Scripps eventually hired for the position.

Ryan stated that she was not merely observing in San Diego, nor did she recall Lucas's telling Scripps that she was there just to observe. During their meetings with

Scripps executives, Lucas introduced Ryan as a "partner," "the title that he used for the team members on his team for executive searches." In Ryan's opinion, she was working directly with Lucas on the search.

Based on their earlier compensation discussions, Ryan felt that she was fully immersed in the search and was working toward an end goal with Lucas. During the trip, she learned that the search fee would be higher ($148,005) than the fee stated in the offer email ($140,834), and she believed that, at some point, Lucas reiterated the percentages based on their agreement. But when Ryan asked Lucas if he had "drawn up" an independent-contractor agreement, he told her that he had not; she then offered to send him sample contracts.

Ryan acknowledged that during the trip, Lucas was working on at least one other executive search for Scripps, but she was claiming that Lucas and Invenias owe her money only for her work on the audit-and-compliance search.

### 5. *Lucas's account of the San Diego trip differs from Ryan's.*

According to Lucas, he invited Ryan to come to San Diego only to observe the search process and to understand how Invenias "do[es] business," not to be involved in any of the three executive searches he was conducting for Scripps at that time. Lucas testified that the San Diego trip's main purpose was to help Scripps evaluate a final candidate for another vice-president position. And Ryan was there to observe the final-candidate interview process.

30

Lucas testified that the audit-and-compliance search was a "very minor piece" of the trip. Of the two interviews in which Ryan participated in San Diego, only one was with a candidate for that position. Lucas had found the candidate without Ryan's help and had already interviewed him before the interview involving Ryan.

Lucas admitted that he and Ryan met with Scripps executives about candidates, but he claimed that those meetings were mainly about candidates for the other two Scripps searches. But he and Ryan did meet with Scripps's general counsel about the audit-and-compliance search and "the five final candidates coming in to interview" for the position. Lucas testified that he did not discuss narrowing down candidates during the trip because "whenever we do a search, we have weekly progress reports or progress calls." Lucas stated that Ryan was never on any of these calls, but he was not sure if she reviewed any progress reports, which were available to her in Invenias's database.

Lucas stated that he introduced Ryan to the Scripps executives as his colleague from Dallas. He also admitted that he introduced Ryan as his "partner," which, according to Lucas, means "senior level" in the executive-recruiting industry. Lucas claimed that although Scripps paid for Ryan (who had "zero experience in executive search") to accompany him to San Diego, it was of "[n]o benefit whatsoever" to Scripps. According to Lucas, "It was a benefit to me and an act of kindness to me [from Scripps]. . . . [t]o allow me to bring Ms. Ryan in to observe and learn."

### 6. *Ryan returns to Texas and continues to work on the search.*

A few days after the San Diego trip, Ryan emailed Lucas two sample independent-contractor agreements and told him to "feel free to edit or use what works for you." Lucas acknowledged receiving them, but the parties still did not sign a written contract memorializing their agreement.

Ryan testified that when she returned to Texas, she continued to work on the search. On November 11, she emailed Lucas: "Any thoughts about how we should split and concur to interview candidates? By my records we had six on the short list and we interviewed [the candidate in San Diego] so that leaves five." Ryan also listed the five candidates. Two days later, Lucas responded, "Yes, Sylene is going to reach out to sched VCs for you to interview [two candidates from the list]." Ryan interviewed those two candidates by videoconference, with each interview lasting an hour to an hour-and-a-half. After the interviews, Ryan prepared written assessments for each candidate and gave Lucas feedback on the interviews.

Additionally, she had "several interactions back and forth with the [Invenias] team, as well as follow up with other candidates." She also reviewed progress reports and other documents related to the search and communicated with Lucas about the search. As far as she knew, Lucas was happy with her work, and he voiced no concerns about her work product or her interest or excitement about the project.

### 7. *Lucas refuses to pay Ryan.*

The same day Ryan emailed Lucas about conducting additional interviews, she emailed him an invoice for $15,047.18 (the first third of her 30.5% fee). That same day, Lucas responded, thanking Ryan and stating that Invenias got a check from Scripps for expenses on another search but that "[o]nce we receive fee payment, I will send you a check."

On November 24, Lucas emailed Ryan: "Cyndi, I'm so sorry, I completely forgot to send your check. If you could send me your bank name, checking account number and routing number, I can simply transfer the funds." At trial, Lucas claimed he was only offering to reimburse Ryan for her expenses.

On December 1, Lucas emailed Ryan again:

Cyndi, I am sorry, but I am really struggling with how best to compensate you as an independent contractor for InveniasPartners. For instance, with regard to the Compliance assignment, you have interviewed 2 candidates, which I truly appreciate however, I am trying to place a value on that. I really do not think we are in need of additional candidates on this project since I have surfaced 4 others.

When we discussed your independent contractor arrangement, we discussed the fact that each of us must contribute to the project equally. I realize you are new to our business however, I have not seen a great deal of interest or initiative in you to "get involved". The passion is clearly missing. I understand you had reservations to begin with, so maybe this is the case; which is absolutely understandable, if this kind of work is not of high interest. I am also well aware of your desire to build your own consulting firm, which I also understand. . . .

About a week later, Ryan emailed Lucas to check on payment. Lucas responded, "Thanks Cyndi; still thinking on how best to structure our relationship, so it is of value for both of us. Regardless, I will send something out tomorrow."

On December 10, Ryan followed up with Lucas again:

I'd love to find a way to restructure our partnership going forward and am still awaiting to review your proposal. However[,] for the work already performed up to December 1st, we had an agreement in place and I submitted an invoice to you in early November that is still outstanding. I understand you're busy, I'd . . . appreciate you dropping a check for the invoice at your earliest convenience.

Lucas responded:

Cyndi, there is absolutely no way I can pay you $15,000 for a trip to San Diego (which was paid for) and interviewing a couple of candidates. I think you would agree, that would be crazy.

If you will remember, I said we needed both to take on equal responsibility for the search, and that has [not] happened. Happy to discuss further.

Lucas never paid Ryan for the work she performed. Their relationship ended around December 15.

Lucas contended that he offered to pay Ryan for her work "multiple times." He estimated that Ryan had worked about 20 hours on the search and offered to pay her $300 per hour. Ryan denied that Lucas had offered her any compensation other than the fee-splitting arrangement described in their emails. She also denied that he discussed paying her an hourly rate. According to Ryan, the only offer Lucas made to her was the fee-splitting arrangement, which she accepted.

### 8. The parties' perceptions of their relationship and of the value of Ryan's work were very different.

In Ryan's view, "[she] was brought on to assist in the search, interviewing candidates, assessing the role, communicating with the client. So [she], in [her] mind, added value to the search." Ryan testified that in addition to the work she performed during the San Diego trip and the two videoconference interviews, she worked on the search from her home office, participating in conference calls, drafting emails, and conducting research.

Ryan admitted that she and Lucas agreed to split the execution responsibilities and denied that they were not equally split. But she was not sure whether she performed the same amount of execution responsibilities that Lucas did. Ryan also acknowledged that the parties' email exchanges did not discuss what those duties were or how they were to be divided. But she admitted that the executive-search-and-consulting guide that Lucas had provided to her in Chicago outlined the five phases of "Search Assignment Execution" and testified that she participated in the specification, recruitment, and assessment stages of the audit-and-compliance search.

In contrast, Lucas testified that Ryan's role was to observe the process, not to be involved in the search. Even though Ryan thought she was part of the search execution, she could not have been because he was already in the later stages of the search when he contacted her in October. Lucas claimed that at that time, he was one month in to what ended up being a five-month search and the search was 60% complete. He also stated that he told Ryan that when she came on board.

35

By the time he contacted Ryan, Lucas had already identified, interviewed, evaluated, and presented candidates to Scripps, and Scripps had expressed interest in five of them. In Lucas's view, "[i]t wouldn't make sense to bring somebody on to join [him] in the execution of assignment" at that point. By the time they went to San Diego, Lucas had already identified the top candidates for the position, and according to Lucas, Ryan knew that. The final candidates interviewed in December 2015 and January 2016, and Scripps made an employment offer to one of them in January 2016.

Lucas testified that Ryan did nothing on the search before the San Diego trip and that she had no contact with Scripps afterward. Even though Ryan emailed him after the trip about dividing the interviews, she was not really involved in the search. In Lucas's opinion, the two candidates Ryan had interviewed by video conference were not in the running for the position, and Scripps chose not to pursue them. Invenias gained no value from these hour-long interviews: Ryan's written candidate assessments had to be redone because she did not follow the correct format. Although Lucas claimed he had to redo the interviews and write new assessments, he did not tell Ryan that because he was "trying to be a nice guy."

Lucas maintained that Ryan did not take on half the execution responsibilities. At most, Ryan had one percent responsibility. According to Lucas, Ryan's work had no value to either Lucas or Invenias, and they got nothing out of their relationship with her. She located no potential candidates for the audit-and-compliance position. She added no value to the final placement for the position because Lucas had already

36

located and interviewed the final placement before Lucas and Ryan interviewed him in San Diego.

Lucas also testified to the search process generally and denied that Ryan had any responsibilities for the audit-and-compliance search. He also denied that Ryan was involved in any of the five phases of the search process outlined in Invenias's executive-search-and-consulting guide. Lucas claimed that Ryan played absolutely no part in the process of presenting the final five audit-and-compliance candidates to Scripps.

Although Lucas typically conducted searches solo, he wanted to work with Ryan in the future. He maintained that the parties did not have a contract but had "conceptually" agreed on what they were "potentially going to put together"—a potential agreement that was unrelated to the audit-and-compliance search. Lucas intended not to involve Ryan in a specific search but to give her an opportunity to observe and learn how Invenias does business. Lucas had never paid any other independent contractors to learn and observe. The first time he realized that Ryan expected to be paid was when he received her invoice.

Lucas admitted that at some point, Invenias posted Ryan's biography on its website and listed her home address as its Dallas office. He also admitted to stating in an email to a potential client that Ryan was a managing partner in Invenias's Dallas office.

## C. Contract Formation

In their first issue, Lucas and Invenias contend that they never formed a contract with Ryan because Lucas's offer was not clear and definite and because there was no "meeting of the minds." Lucas and Invenias admit on appeal that Lucas offered to pay Ryan if she equally split the execution responsibilities with him. But, they argue, "[w]ithout inclusion of what the execution responsibilities were or how they would be divided, the terms of Mr. Lucas'[s] offer were too vague to constitute an enforceable contract." Lucas and Invenias further argue that there was no "meeting of the minds" regarding the contract's essential terms because the parties planned to enter into a written contract formalizing their agreement that not only outlined the execution responsibilities and how to divide them, but also included a nondisclosure agreement. Ryan counters that the evidence was sufficient for the trial court to conclude that the parties had an implied-in-fact contract.

### 1. Applicable law

A valid contract is an essential element of a breach-of-contract claim. *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.). A binding contract requires (1) an offer, (2) an acceptance in strict compliance with the offer's terms, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 720 (Tex. App.—Fort Worth 2008, pet. dism'd). A valid offer requires, in part, that the terms of

the offer are clear and definite. *KW Constr. v. Stephens & Sons Concrete Contractors, Inc.*, 165 S.W.3d 874, 883 (Tex. App.—Texarkana 2005, pet. denied). "Meeting of the minds" refers to the parties' mutual understanding of and assent to the subject matter and essential terms of the contract. *City of The Colony*, 272 S.W.3d at 720.

Mutual assent concerning material, essential terms is a prerequisite to forming a binding, enforceable contract. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). The parties can agree to the material terms and leave other matters open for later negotiations, but if an essential term is left open for future negotiations, no binding contract exists. *City of The Colony*, 272 S.W.3d at 720. The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. *McCoy v. Alden Indus., Inc.*, 469 S.W.3d 716, 728 (Tex. App.—Fort Worth 2015, no pet.). Thus, whether the parties intended to enter into a binding agreement is often a fact question. *Id.* But whether an agreement is legally enforceable is a legal question. *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

A contract's material terms must be sufficiently definite and reasonably certain to both parties. *See Fort Worth I.S.D. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). All material terms must be agreed on before a contract can be enforced. *T.O. Stanley*, 847 S.W.2d at 221. A contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. *Fort Worth I.S.D.*,

39

22 S.W.3d at 846. "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain." *Id.*

A contract's "essential terms" might include time of performance, price to be paid, work to be done, service to be rendered, or property to be transferred. *Learners Online, Inc. v. Dallas I.S.D.*, 333 S.W.3d 636, 643 (Tex. App.—Dallas 2009, no pet.). Material and essential terms are those that the parties would reasonably regard as "vitally important ingredient[s] of their bargain." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Material terms are determined on a case-by-case basis. *Id.* (citing *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013)). And "[e]ach contract should be considered separately to determine its material terms." *Id.* (quoting *T.O. Stanley*, 847 S.W.2d at 221).

A contract can be express or implied-in-fact. The former "arises when the contractual terms are stated by the parties." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). In such a contract, mutual assent is expressly stated. *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 557 (Tex. App.—Houston [14th Dist.] 2002, no pet.). In contrast, an implied-in-fact contract "arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract." *Id.* An implied-in-fact contract must include mutual assent through a meeting of the minds, but these requirements may be inferred from the parties' conduct and course of dealing. *See Tex.*

*Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 133 (Tex. 2000); *Haws & Garrett Gen. Contractors*, 480 S.W.2d at 609.

### 2. Analysis

Here, the "execution responsibilities" and the division of those responsibilities were among the material and essential terms of the parties' agreement because Lucas agreed to split the 61% professional fee with Ryan *only if* they equally split the execution responsibilities. *See Fischer*, 479 S.W.3d at 237; *Learners Online*, 333 S.W.3d at 643. In other words, Lucas's offer was an all-or-nothing arrangement with Ryan: he was obligated to pay her only if she completed half the execution responsibilities.

Ryan admitted that neither the parties' emails nor any other document Lucas provided to her explained what the execution responsibilities were or how she and Lucas were to divide them. On appeal, Ryan asserts that the parties' leaving "the details of splitting the execution responsibilities for future discussions does not render the contract unenforceable" and that the executive-search-and-consulting guide that Lucas gave to Ryan months before their agreement adequately outlined the executive-search responsibilities and the division thereof.

The guide outlines the search process in general terms. And when describing an arrangement in which two partners agree to split the execution responsibilities, the guide states that it is assumed that both parties contribute to the project equally, which means that

> . . . the two partners "split" <u>all activities</u> related to the search assignment, i.e., securing the assignment, attend all client/stakeholder meetings on

41

the front end, during the assignment, development and writing of the Position Specification, actively participate in identifying prospective candidates for the search (research), equally participate in all candidate pre-qualifying (phone) and face to face interviewing, equally participate in all candidate write-ups and appraisals, assist in developing written progress reports, participate in all progress calls/meetings with the client, participate in the development of candidate interview questions and evaluation forms for the client, equally participate in all reference and background checking, attend initial candidate interviews at client site, assist in the negotiation of compensation package with client and candidate, closing the assignment, etc.

But Ryan's response to Lucas's offer—she "would be interested to hear more about how to divide the responsibilities and how you prefer to approach"—shows that she did not understand that, under Lucas's offer, this is how the responsibilities were to be divided. Thus, even though Ryan testified at trial that she and Lucas agreed to equally split the execution responsibilities, we conclude that based on the objective standard of what the parties said and did, Ryan did not prove a meeting of the minds on this essential contract term. Accordingly, the trial court erred to the extent it found that the parties had a legally enforceable contract, and we sustain this part of Lucas and Invenias's first issue. We need not address the remainder of their first issue.

## D. Promissory Estoppel

In their second issue, Lucas and Invenias argue that the evidence is insufficient to support recovery on Ryan's promissory-estoppel claim. "Under the theory of promissory estoppel, a party that has failed to prove a legally sufficient contract, but has acted in reliance upon a promise to his detriment, may be compensated for his foreseeable, definite, and substantial reliance." *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786,

794 (Tex. App.—Dallas 2007, no pet.) (citing *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965)). In a promissory-estoppel action, a plaintiff's recovery is limited solely to reliance damages, which are the amounts necessary to restore the plaintiff to the position in which she would have been had she not relied on the promise. *See Fretz Constr. Co. v. S. Nat'l Bank of Hous.*, 626 S.W.2d 478, 483 (Tex. 1981); *Lamajak*, 230 S.W.3d at 794 ("The damages recoverable under [a promissory-estoppel] theory are not the profits the promisee expected from acting in reliance on the promise, but the amount necessary to put the promisee in the position he would have been in if he had not so acted."). Neither expectation nor benefit-of-the-bargain damages are recoverable. *See Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 927 (Tex. App.—Austin 2008, no pet.) (op. on reh'g).

On appeal, Ryan asserts that she was damaged because in reliance on Lucas's promise to pay her for her work, she "did not pursue other employment opportunities during the parties' business relationship because she was committed to working with Invenias on the Scripps project." But "[r]eliance damages, similar to out-of-pocket recovery, reimburse one for expenditures made toward the execution of the contract in order to restore the status quo before the contract." *Id.* at 926 (quoting *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex. App.—Amarillo 1997, pet. denied)). Ryan admitted that she was reimbursed for her expenses, and she presented no evidence of any other expenditures made in reliance on any alleged promise by Lucas or Invenias. Accordingly, we sustain Lucas and Invenias's second issue.

## E. Quantum Meruit

In their third issue, Lucas and Invenias argue that that the evidence is insufficient to support Ryan's quantum-meruit claim. To recover under a quantum-meruit theory, Ryan had to prove that: (1) she provided valuable services to Lucas and Invenias, (2) they accepted those services, and (3) they had reasonable notice that Ryan expected compensation for those services. *See Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). In this case, the measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed. *See Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 736 (Tex. 2018).

On appeal, Lucas and Invenias contend that Ryan did not provide valuable services to them because her services were of little or no benefit. *See Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985) (concluding that quantum-meruit plaintiff must show that his efforts both benefited the defendant and were undertaken "for the person sought to be charged," explaining that although the defendant "may well have received benefits traceable to [the plaintiff's] effort . . . those benefits [were] only incidental, and create[d] no claim for compensation"). They also complain that Ryan offered no evidence of the reasonable value of her services. *See Hill*, 544 S.W.3d at 736.

At trial, Lucas denied that Ryan was involved in the search and that either he or Invenias benefited from her services. He maintained that Ryan had virtually no experience in executive search and that her participation in the audit-and-compliance

search was limited to observing the process. But the trial court could have disbelieved his version of events. Ryan is a highly experienced human-resources and executive-search-and-talent-advisory-services professional with 20 years' experience in human resources in the healthcare field. And she was adamant that she was involved in the search, testifying extensively about her involvement: the trip to San Diego; sundry conference calls and emails; research; two videoconference interviews; and written candidate assessments. Lucas later bolstered Ryan's contention that she worked on the search and that her work had value by testifying that he estimated that Ryan had performed about 20 hours of work in San Diego and that he had offered to pay her $300 per hour for that work.

Viewing the evidence under the applicable review standard, we conclude that the evidence is sufficient to support a finding that Ryan provided services valued at $300 per hour to Lucas and Invenias. But the evidence is legally insufficient to support a $43,000 damages finding under a quantum-meruit theory. Ordinarily, when the evidence is legally insufficient to support a finding, we reverse and render. *See Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176–77 (Tex. 1986); *see also* Tex. R. App. P. 43.3. But here, the evidence is legally sufficient to support a lesser damages amount. In this context, the proper remedy is to reverse and remand for a new trial on Ryan's quantum-meruit claim. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex. 1998) (op. on reh'g) (holding that appellate court can remand for a new trial when no evidence supports damages awarded but there is

45

evidence of some damages). And because liability was contested and the damages are unliquidated, we must remand for a new trial on both liability and damages on Ryan's quantum-meruit claim. *See* Tex. R. App. P. 44.1(b) (stating that appellate court may not order separate trial solely on unliquidated damages if liability is contested); *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 n.8 (Tex. 2015); *Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001).

Having concluded that the evidence is sufficient to support a finding that Ryan provided valuable services to Lucas and Invenias and because there was some evidence of the reasonable value of Ryan's services, we overrule those parts of Lucas and Invenias's third issue. But we sustain the remainder of this issue because the evidence is legally insufficient to support the damages amount found by the trial court.

## F. Negligent Misrepresentation

In their fourth issue, Lucas and Invenias argue that the evidence is insufficient to support recovery on Ryan's negligent-misrepresentation claim. To prevail on this claim, Ryan was required to prove, among other things, that Lucas's and Invenias's negligent misrepresentations proximately caused her to suffer pecuniary loss. *See Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 760 n.9 (Tex. App.—Fort Worth 2012, pet. denied) (citing *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999)). Benefit-of-the-bargain damages are not recoverable in a negligent-misrepresentation action. *See Fed. Land Bank Ass'n of Tyler v.*

*Sloane*, 825 S.W.2d 439, 442–43 (Tex. 1991). In such an action, a plaintiff can recover damages only for pecuniary loss, which includes (1) the difference between the value of what the plaintiff has received in the transaction and its purchase price or other value given for it and (2) loss otherwise suffered as a consequence of the plaintiff's reliance on the misrepresentation. *D.S.A., Inc. v. Hillsboro I.S.D.*, 973 S.W.2d 662, 663–64 (Tex. 1998).

We have reviewed the entire record using the applicable standard of review and find no evidence that any of Lucas's or Invenias's representations caused Ryan to suffer any pecuniary loss. On appeal, she asserts that as a consequence of her reliance on Lucas's misrepresentations, "she suffered damages in that instead of pursuing her own clients for her company, Más Talent, she devoted her time and energy to Invenias." At trial, however, Ryan offered no evidence that she would have been pursuing other clients had she not been engaged in the audit-and-compliance search. Rather, she testified that her business was in the "startup phase" in fall 2015 and that she was "cultivating clients" and "setting up the business structure." She already had several clients, but because she "was not engaged at the time" with any of them, she had time to take on the audit-and-compliance search. Viewing this evidence under the applicable review standard, it is legally insufficient to prove that Ryan suffered any pecuniary loss as a result of any alleged misrepresentations by Lucas or Invenias. We therefore sustain their fourth issue.

## IV.
## Conclusion

We affirm the trial court's order denying Lucas's and Invenias's special appearances. We reverse the trial court's judgment; render judgment that Ryan take nothing on her claims for breach of contract, promissory estoppel, and negligent misrepresentation; and remand Ryan's quantum-meruit claim to the trial court for a new trial on both liability and damages.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: June 27, 2019